**Seymour B. SHIFFMAN, Plaintiff,**

**v.**

**Reuben O'Donovan ASKEW, Governor of the State of Florida, and Robert Shevin, Attorney General for the State of Florida, Defendants.**

**Catherine L. MAKRES, Plaintiff,**

**v.**

**Reuben O'Donovan ASKEW, Governor of the State of Florida, and Robert Shevin, Attorney General for the State of Florida, Defendants.**

**Civ. Nos. 73–38, 71–401.**

United States District Court,
M. D. Florida,
Tampa Division.

June 1, 1973.

Richard A. Bokor, Tampa, Fla., Larry H. Spalding, Sarasota, Fla., for plaintiffs.

Jerry E. Oxner, Asst. Atty. Gen., Tallahassee, Fla., Herbert T. Schwartz, of Schwatrz, Schwartz & Lo Pucki, Gainesville, Fla., for defendants.

## MEMORANDUM OPINION

HODGES, District Judge.

Following the lead of recent decisions concerning statutory durational residency requirements, the Plaintiffs in these cases challenge the constitutionality of Florida Statute § 61.021 (1971), F.S.A. A provision familiar to all lawyers, that section dictates that in order to obtain a dissolution of marriage ". . . the party filing the proceeding must reside six months in the state before filing the petition . . ."

Plaintiffs allege that they recently moved into the state as residents with the intention to make Florida their permanent home, and that their respective marriages are irretrievably broken [1] so that, but for the residency requirements of the statute, they would immediately institute proceedings in the state courts seeking dissolution of those marriages. The jurisdiction of this Court is invoked pursuant to 42 U.S.C.A. § 1983 and 28 U.S.C.A. §§ 1343(3), 2201 and 2202.

The suits were filed as class actions pursuant to Rule 23, F.R.Civ.P.,[2] and the relief sought is a declaratory decree and injunction prohibiting the state from continuing to enforce its residency law.[3]

Two preliminary questions must be considered. First is the State's motion that this Court abstain from the exercise of jurisdiction pending consideration of the issues by the Courts of Florida. Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Principal reliance is placed upon Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970), but this is not a case involving an underlying criminal prosecution, as in *Younger,* and neither is it a case in which the issue of state law is unsettled, as in *Reetz,* so that a state court construction of the statute might avoid a constitutional confrontation and a possible irritant in the federal-state relationship. In the absence of such special circumstances abstention is unwarranted. E. g., Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964). The second preliminary question is whether the claim is

1. Chapter 71–241 (Laws of Florida, 1971) extensively amended the Florida Divorce law. The former statute enumerating the specific grounds required for granting a divorce was repealed, and the new code provides that a "dissolution" may be decreed upon a finding that the marriage is "irretrievably broken." Florida Statute § 61.052 (1971), F.S.A.

2. The State has stipulated that the Plaintiffs fairly and adequately represent a class of individuals "who are *bona fide* residents of the State of Florida, who have lived in the State for less than six (6) months, and who, but for the provisions of Florida Statute 61.021, would immediately petition a Circuit Court in the State of Florida for a Dissolution of Marriage."

3. The two separate actions, virtually identical in form and substance, were

consolidated pursuant to Rule 42(a), F.R. Civ.P. In view of the nature of the suits and the relief requested, notice was given to the Chief Judge of this Circuit pursuant to 28 U.S.C.A. § 2281 et seq., but Judge Brown declined to convene a three-judge court (due, at least in part, to the improbability of injunctive relief being granted in addition to a declaratory decree, even assuming the Plaintiffs prevail.) See and compare Zwickler v. Koota, 389 U.S. 241, 254, 88 S.Ct. 391, 399, 19 L.Ed.2d 444 (1967) concerning the necessity of considering a request for declaratory judgment independently of a request for injunctive relief, and Kennedy v. Mendoza-Martinez, 372 U.S. 144, 152–154, 83 S.Ct. 554, 559–560, 9 L.Ed.2d 644 (1963) concerning the establishment of three-judge courts when declaratory relief is granted without injunctive implementation.

moot since the named Plaintiffs could now satisfy the residency requirement of the statute they attack. It is established, however, particularly in class actions of this kind, that mootness does not occur when the issue is a continuing one "capable of repetition, yet evading review." E. g., Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 712–713, 35 L.Ed.2d 147 (1973); Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969). It is necessary, therefore, to consider the merits of Plaintiffs' claim.

The Plaintiffs' argument begins, chronologically, with the Supreme Court's decision in United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966), builds upon other opinions rendered in the interim, and culminates with the recent decisions in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed. 2d 201 (1973). *Guest* is the launching pad because it was there that the right of interstate travel was characterized as a basic constitutional right despite ". . . recurring differences in emphasis within the Court as to the source of [that right]." (383 U.S. at 759, 86 S.Ct. at 1179). With the pad thus constructed the first significant launching occurred in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), in which the Court invalidated a one year residency requirement as a prerequisite to the receipt of state welfare assistance. The residency restriction was held to be violative of Equal Protection and especially the right to travel. The precedential significance of the decision was the Court's application of the "compelling state interest" test. If the sole constitutional challenge had been an asserted denial of Equal Protection, the "traditional" standard would have been applied and the classification approved unless found to be "without any reason-

able basis." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911), cited in *Shapiro*, 394 U.S. at 638, 89 S.Ct. at 1333, note 20. The Court concluded:

> "But, of course, the traditional criteria do not apply in these cases. Since the classification here touches on the fundamental right of interstate movement, its constitutionality must be judged by the stricter standard of whether it promotes a *compelling* state interest. Under this standard, the waiting-period requirement clearly violates the Equal Protection Clause." (394 U.S. at 638, 89 S.Ct. at 1333).

The practical utility of the right to travel having been forcefully demonstrated as a means of potent constitutional assault, particularly with regard to residency requirements, the next application occurred in Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). In that instance the Court vitiated Tennessee's durational residency requirement as a pre-condition to registration as an elector, leaning heavily upon *Shapiro* and indicating that *any* durational residency condition imposed by a state necessarily impinges upon the right to travel so that it can pass constitutional muster only if supported by a compelling state interest.

These principles were most recently solidified in the Court's so-called abortion cases, Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). In the latter opinion the Court held the residency requirement of the Georgia statute to be unconstitutional, citing the right to travel concept of *Shapiro* as well as the Privileges and Immunities Clause (93 S.Ct. at 751–752).[4]

■ Plaintiffs thus mount a substantial multi-faceted constitutional challenge arguing a denial of equal protection, violation of the right to travel,

---

4. See Besaw v. Affleck, 333 F.Supp. 775, 780, note 7 (D.R.I.1971), for a series of citations to other recent decisions deal-

ing with durational residency requirements in general.

breach of the privileges and immunities clause, and, citing Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), denial of due process and access to the courts. It cannot be said, however, that any or all of these various decisions necessarily compel a conclusion that all statutory durational residency requirements are *per se* unconstitutional. Rather, they stand for the proposition that such restrictions must be supported by a "compelling state interest." And while the compelling interest standard is a stringent one, to be sure, as demonstrated by the results achieved in these same decisions, it would be paradoxical to assume that compelling interests are altogether non-existent.

The precise issue—durational residency as a precondition to suit for divorce —has been judicially considered on four occasions with divergent results. Wymelenberg v. Syman, 328 F.Supp. 1353, (E.D.Wis.1971); Place v. Place, 278 A. 2d 710 (Vt.1971); Whitehead v. Whitehead, 492 P.2d 939 (Hawaii 1972); Coleman v. Coleman, 32 Ohio St.2d 155, 291 N.E.2d 530 (1972). The three-judge District Court in *Wymelenberg* struck the statute while the three state decisions upheld it. For the reasons that follow, I have concluded that the Florida Statute is supported or justified by a compelling state interest and is entitled to constitutional exoneration.

From the inception of our Federal system through Pennoyer v. Neff[5] to the equally well known decisions in *Williams* I and II,[6] and most recently in Boddie v. Connecticut, supra, the Supreme Court has consistently recognized the unique status of marriage and divorce as involving a myriad of socio-legal ramifications, virtually all of which are left to the exclusive province of the states. In 1858 the Court declared:

> "Our first remark is—and we wish it to be remembered—that this is not a suit asking the court for an allowance of alimony . . .

> "We disclaim altogether any jurisdiction in the courts of the United States upon the subject of divorce, or for the allowance of alimony . . ." Barber v. Barber, 62 U.S. (21 How.) 582, 584, 16 L.Ed. 226 (1858).[7]

Mr. Justice Frankfurter addressed the subject as frequently, and certainly as exhaustively, as any other member of the Court. E. g., *Williams* I, 317 U.S. at 304, 63 S.Ct. at 216 (concurring opinion); *Williams* II, 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577 (majority opinion); Sherrer v. Sherrer, 334 U.S. 343, 356, 68 S.Ct. 1087, 1097, 92 L.Ed. 1429 (1948) (dissenting opinion). In the latter case he said:

> "If the marriage contract were no different from a contract to sell an automobile, the parties thereto might well be permitted to bargain away all interests involved, in or out of court. But the State has an interest in the family relations of its citizens vastly different from the interest it has in an ordinary commercial transaction. That interest cannot be bartered or bargained away by the immediate parties to the controversy by a default or an arranged contest in a proceeding for divorce in a State to which the parties are strangers."

\*　　\*　　\*　　\*　　\*　　\*

---

5. 95 U.S. 714, (5 Otto.), 24 L.Ed. 565 (1877).

6. Williams v. North Carolina, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279 (1942); Williams v. North Carolina, 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945).

7. See also, Ex parte Burrus, 136 U.S. 586, 593–594, 10 S.Ct. 850, 853, 34 L. Ed. 500 (1890); State of Ohio ex rel. Popovici, 280 U.S. 379, 383, 50 S.Ct. 154, 155, 74 L.Ed. 489 (1930); and especially Druen v. Druen, 247 F.Supp. 754 (D. Colo.1965) in which many other federal decisions are cited and the conclusion reached that a suit for divorce is not removable from state court pursuant to 28 U.S.C.A. § 1441 even though diversity of citizenship and the requisite jurisdictional amount are shown to exist under 28 U.S.C.A. § 1332.

"That society has a vital interest in the domestic relations of its members will be almost impatiently conceded. . . . Nowhere in the United States, not even in the States which grant divorces most freely, may a husband and wife rescind their marriage at will as they might a commercial contract. Even if one thought that such a view of the institution of marriage was socially desirable, it would scarcely be held that such a personal view was incorporated into the Constitution or into the law for the enforcement of the Full Faith and Credit Clause enacted by the First Congress. 1 Stat. 122, 28 U.S.C. § 687, 28 U.S.C. A. § 687. That when the Constitution was ordained divorce was a matter of the deepest public concern, rather than deemed a personal dispute between private parties, is shown by the fact that it could be secured almost exclusively only by special enactments of the several legislatures and not through litigation in court. See Ireland and Galindez, Divorce in the Americas (1947) p. 1.

"As a contract, the marriage contract is unique in the law. To assimilate it to an ordinary private contract can only mislead. See Maynard v. Hill, 125 U.S. 190, 210–214, 8 S.Ct. 723, 729–731, 31 L.Ed. 654; Restatement of the Law, Contracts, §§ 584, 586; cf. Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 627–629, 4 L.Ed. 629. The parties to a marriage do not comprehend between them all the interests that the relation contains. Society sanctions the institution and creates and enforces its benefits and duties. As a matter of law, society is represented by the permanent home State of the parties, in other words, that of their domicile." (334 U.S. at 358–360, 68 S.Ct. at 1098–1099).

The intense and exclusive interest of the states, as well as the relative peculiarity of divorce as a justiciable controversy, has also been recognized from other constitutional vantage points. In Pennoyer v. Neff, supra, the Court took care to specifically exclude suits for divorce from its landmark ruling concerning the limitations imposed by the due process clause upon the reach of constructive service of process (95 U.S. (5 Otto.) at 734–735). This was in keeping, of course, with the universal concept that a suit for divorce is in the nature of an action *in rem,* with the marriage as the *res,* so that constructive service is effective to obtain jurisdiction of an absent spouse at least for the purpose of dissolving the marriage. See Atherton v. Atherton, 181 U.S. 155, 21 S.Ct. 544, 45 L.Ed. 794 (1901). But the presence of the *res* as the basis of jurisdiction depends in the first instance upon the domicile of the plaintiff in the state of the forum. Bell v. Bell, 181 U. S. 175, 21 S.Ct. 551, 45 L.Ed. 804 (1901).

Then came *Williams* I and *Williams* II in which the familiar facts were these. Williams abandoned his wife in North Carolina and proceeded to Nevada where he obtained a divorce by way of constructive service of process. He then married another and returned with his bride to North Carolina. He was prosecuted and convicted of bigamy. Relying upon Haddock v. Haddock, 201 U.S. 562, 26 S.Ct. 525, 50 L.Ed. 867 (1906), North Carolina took the position that the matrimonial domicile did not accompany Williams to Nevada since he was at fault in abandoning his wife, and that, as a matter of law, the Nevada Court lacked jurisdiction to grant him a divorce. Assuming as a fact that Williams had become a personal domiciliary of Nevada, the Supreme Court overruled *Haddock,* reversed Williams' conviction and remanded the case. The Nevada decree was held to be presumptively valid, at the least, and thus entitled to full faith and credit in North Carolina. Williams was then tried again, and again convicted based upon a *factual* determination that no *bona fide* domicile had been established in Nevada. This time (*Williams* II) the Court affirmed the conviction by balancing the interests

of each state and holding that a factual determination of domicile in one is subject to collateral attack in the other. The following passages from the opinion of Mr. Justice Frankfurter are so directly related to the compelling interest issue in the case *sub judice* that extensive quotation is justified (325 U.S. at 229–231, 65 S.Ct. at 1095–1096):

"Under our system of law, judicial power to grant a divorce—jurisdiction, strictly speaking—is founded on domicil. Bell v. Bell, 181 U.S. 175, 21 S.Ct. 551, 45 L.Ed. 804; Andrews v. Andrews, 188 U.S. 14, 23 S.Ct. 237, 47 L.Ed. 366. The framers of the Constitution were familiar with this jurisdictional prerequisite, and since 1789 neither this Court nor any other court in the English-speaking world has questioned it. Domicil implies a nexus between person and place of such permanence as to control the creation of legal relations and responsibilities of the utmost significance. The domicil of one spouse within a State gives power to that State, we have held, to dissolve a marriage wheresoever contracted. In view of Williams v. North Carolina, supra, the jurisdictional requirement of domicil is freed from confusing refinements about 'matrimonial domicil', see Davis v. Davis, 305 U.S. 32, 41, 59 S.Ct. 3, 6, 83 L.Ed. 26, 118 A.L.R. 1518, and the like. Divorce, like marriage, is of concern not merely to the immediate parties. It affects personal rights of the deepest significance. It also touches basic interests of society. Since divorce, like marriage, creates a new status, every consideration of policy makes it desirable that the effect should be the same wherever the question arises."

\* \* \* \* \* \*

"But those not parties to a litigation ought not to be foreclosed by the interested actions of others; especially not a State which is concerned with the vindication of its own social policy and has no means, certainly no effective means, to protect that interest against the selfish action of those outside its borders. The State of domiciliary origin should not be bound by an unfounded, even if not collusive, recital in the record of a court of another State."

\* \* \* \* \* \*

"If a finding by the court of one State that domicil in another State has been abandoned were conclusive upon the old domiciliary State, the policy of each State in matters of most intimate concern could be subverted by the policy of every other State. This Court has long ago denied the existence of such destructive power."

■■■■ The significance of these authorities vis-a-vis the present case is threefold. First, it is indelibly ingrained in our federal system that the entire field of marriage and divorce is left to the individual regulation of the several states. Secondly, the states have a vital and individual interest in such regulation, not only with respect to the effective implementation of their own internal policies, but also in avoiding any intrusion upon the authority and policies of a sister state concerning the same marriage or the same parties. Thirdly, the states have an equally vital and closely related interest in assuring the future validity and integrity of their judicial decrees, particularly in ex parte proceedings predicated upon constructive service of process, because those decrees are subject to collateral attack in other jurisdictions and may frequently involve the personal and property rights of third persons whose legal interests are peculiarly dependent upon those decrees, i. e., subsequent spouses of the parties, the children of both, their respective estates and others.[8]

Florida thus has a vital interest—a compelling state interest—in requiring a

---

8. See Johnson v. Muelberger, 340 U.S. 581, 71 S.Ct. 474, 95 L.Ed. 552 (1951), and Cook v. Cook, 342 U.S. 126, 72 S.Ct. 157, 96 L.Ed. 147 (1951).

provable [9] durational residency as a demonstrative or objective means of establishing domicile so that it simultaneously (a) avoids intrusion upon the rights and interests of a sister state that might otherwise be paramount, and (b) insures the integrity of its judicial decrees, not merely as a matter of internal domestic policy, but more importantly as against *future* collateral attack in distant courts and in proceedings involving other individual parties who may be put to factual proof of actual domicile in support of the state's decree.[10]

In Wymelenberg v. Syman, supra, the state apparently suggested four justifications or interests in support of its durational residency requirement, three of which were properly brushed aside as frivolous.[11] The fourth—"to assure residence"—was also given short shrift treatment by the Court on the basis that a similar argument had been rejected in *Shapiro*; that the residency requirement created an irrebuttable presumption that domicile could not be established in less time than the specified durational period; and that a far less drastic method of determining domicile was available. The Court thus held the Wisconsin statute unconstitutional, relying exclusively upon *Shapiro*.

Although other reasons were conjured up by the states when the provisions came under attack, it seems manifest that the principal and perhaps the only real objective of the residency requirements considered in *Shapiro* was to deter the attraction and resulting migration of poor people to higher state benefits. There was, in short, a direct and constitutionally impermissible limitation upon the right to travel compounded by the fact that such restriction related, in turn, to the exigent sustenance of life itself through state assistance. These considerations must be contrasted with their counterparts in the setting of a divorce. The limitation on travel is less direct and the right being restricted is less urgent.[12] To be sure, the Court subsequently warned in Dunn v. Blumstein that the "potency" or degree of restriction on travel is irrelevant to the threshold determination as to whether a classification is created which "triggers" the compelling state interest test rather than the traditional equal protection test (405 U.S. at 340, 92 S.Ct. at 1000); but, as previously noted, this cannot be taken

9. Florida Statute § 61.052(2) (1971), F.S.A., provides in part:
"Based on the *evidence* at the hearing, which evidence need not be corroborated *except to establish that the residence requirements of § 61.021 are met*, the court shall dispose of the petition for dissolution of marriage as follows . . ." (Emphasis supplied).
See also, Brown v. Brown, 123 So.2d 382, 383 (Fla.App.2d Dist.1960), in which the Florida court noted that the residency requirement "adds an additional phase to 'domicile' . . . The domicile involves the intent of the individual. The residence is a matter of objective fact."

10. To those who may be tempted to characterize the latter interest as a form of fictional, legalistic legerdemain without real substance, consideration should be given to the comment of Mr. Justice Douglas in *Williams* I that: "The reality of a sentence to prison [for bigamy] proves that that is no mere play on words." (317 U.S. at 300, 63 S.Ct. at 214). It is also proper to note that a substantial percentage of the reported cases seem to involve Florida decrees. See e. g., Johnson v. Muelberger and Cook v. Cook, supra, note 8; and Anglin v. Anglin, 211 Miss. 405, 51 So.2d 781 (1951).

11. Those suggested purposes were: (a) to deter those with marital problems from entering the state; (b) to maintain marital stability; and (c) to protect the state's reputation. (328 F.Supp. at 1355).

12. As noted by each of the state court decisions in Place v. Place, Whitehead v. Whitehead and Coleman v. Coleman, supra, it is difficult if not impossible to imagine any urgent need for a divorce *per se*. Ancillary relief normally associated with such cases as, for example, the need for support and maintenance, child custody, prevention of physical abuse and the like, are all available either by statute (Chapter 88, Florida Statutes, F.S.A., Uniform Reciprocal Enforcement of Support Law) or by equitable procedures that are independent of the residency requirement in the divorce law.

to mean that all such classifications involving the right to travel are *per se* unconstitutional or that there is no such thing as a compelling interest sufficient to meet the test. Indeed, the degree of the restriction on travel and the nature of the right qualified by the residency requirement (a suit for divorce or welfare assistance or the right to vote), *must* ultimately be weighed and balanced in relation to the interest served by the restriction. Otherwise, the standard by which to measure the "compelling" nature of such interest would be decimated and the final determination of constitutionality would be made in a sterile vacuum.

Similarly, it is insufficient to refer to *Shapiro* and say, without more, that the residency requirement creates an irrebuttable presumption that domicile cannot be established in less time than the prescribed durational residency period. Such a "presumption" is the effect of the statute, of course, but if that feature is offered as a dispositive conclusion with regard to the constitutional issue it is insufficient because it begs the question. That is, the so-called presumption is merely the *manner* in which one class of residents is treated differently than another class, and the ultimate question remains—is that classification and presumption justified by a "compelling" state interest?

In both *Shapiro* and Dunn v. Blumstein the Court rejected the contention that a compelling state interest existed in the desire to obtain objective or tangible proof of *bona fide* domicile as supplied by durational residency requirements. In each instance, however, the Court meticulously examined the factual as well as the legal need for such proof in the light of the total statutory schemes involved, the availability and actual use in practice of "less drastic" means of accomplishing the same objective, and the nature and importance of the right being subjected to the qualification, i. e., welfare assistance or the necessities of life, and the fundamental, constitutional right to vote.

Thus, in *Shapiro* the Court noted that the residence requirement and the one year waiting period were, in actual application, entirely distinct and independent prerequisites since there were certain statutory exceptions to the durational residency condition; and, even more significantly, the presumption supplied by the statute was unneeded and not relied upon in any domiciliary sense because the welfare authorities in fact took pains to investigate each applicant's employment, housing and family situation before granting welfare aid.[13] Under those circumstances, particularly when viewed against the specter of destitute families whose means of sustenance was in issue, the state's interest in durational residency became wholly transparent. A less drastic means of verifying domicile and the other qualifying requisites to welfare assistance was not only available, it was being employed.

Similarly, in Dunn v. Blumstein the Court emphasized that the one year durational residency requirement in addition to a thirty day book closing period before elections was alone sufficient to demonstrate that the longer durational requirement served no useful purpose in fact:

"Moreover, to the extent that the State makes an enforcement effort after the oath is sworn, it is not clear what role the durational residence requirement could play in protecting fraud. The State closes the registration books 30 days before an election to give officials an opportunity to prepare for the election. Before the books close, anyone may register who claims that he will meet the durational residence requirement at the time of the next election. Although Tennessee argues that this 30-day period between registration and election does

---

13. *Wymelenberg* seemingly involved the same feature, not present in the Florida law. The Wisconsin statute provided for a Family Court Commissioner with apparent investigative authority and a legal duty to advise the court as to the merits of the action in each proceeding for divorce.

not give the State enough time to verify this claim of bona fide residence, we do not see the relevance of that position to this case. As long as the State permits registration up to 30 days before an election, a lengthy durational residence requirement does not increase the amount of time the State has in which to carry out an investigation into the sworn claim by the would-be voter that he is in fact a resident."

\*   \*   \*   \*   \*   \*

"At the outset, the State is faced with the fact that it must defend two separate waiting periods of different lengths. It is impossible to see how both could be 'necessary' to fulfill the pertinent state objective. If the State has itself determined that a three-month period is enough time in which to confirm bona fide residence in the State and county, obviously a one year period cannot also be justified as 'necessary' to achieve the same purpose. Beyond that, the job of detecting non-residents from among persons who have registered is a relatively simple one. It hardly justifies prohibiting all newcomers from voting for even three months. To prevent dual voting, state voting officials simply have to cross-check lists of new registrants with their former jurisdictions." (405 U.S. at 347–348, 92 S.Ct. at 1005–1006).

In the final analysis, therefore, the 30 day book closing period was found to be an existing, less drastic means of accomplishing the otherwise legitimate purposes of the durational residency requirement so that the latter was held to be constitutionally impermissible and superfluous. It restricted not only the constitutional right to travel, but also the fundamental right to vote. Even so, it is significant that in reaching this result the Court effectively *approved* the 30 day residency or waiting period as serving a compelling state interest. And the fact that such residency requirements can be "supported by suffi-

ciently strong local interests to pass constitutional muster" is further exemplified by the Court's more recent decision in Marston v. Lewis, 410 U.S. 679, 93 S. Ct. 1211, 1212, 35 L.Ed.2d 627 (1973).

In *Marston* the Court reversed a three-judge District Court and upheld the Arizona statute prescribing a 50 day durational residency requirement coincident with the closing of voter registration books. The opinion concluded:

"In the present case, we are confronted with a recent and amply justifiable legislative judgment that 50 days rather than 30 is necessary to promote the State's important interest in accurate voter lists. The Constitution is not so rigid that that determination *and others like it* may not stand." (410 U.S. at 681, 93 S.Ct. at 1213) (Emphasis supplied).

See also Hadnott v. Amos, 320 F.Supp. 107 (M.D.Ala.1970), affirmed, 401 U.S. 968, 91 S.Ct. 1189, 28 L.Ed.2d 318 (1971), in which the Court found that durational residency requirements as to certain candidates were supported by compelling state interests while those pertaining to voters were not.

■ In summary, it may be said beyond peradventure that many state residency requirements have been born or perpetuated as a result of legislative habit or an occasional display of provincialism with little or no deliberative thought being given to the purpose or lack of purpose involved, or whether other provisions in the particular statutory scheme were already sufficient to accomplish that purpose. This is not so in the case of divorce. Residency requirements are the *sine qua non* of domicile, and domicile is peculiarly essential, not merely because of technical or abstract jurisdictional considerations relevant only to the state's internal policies or procedures, but because a divorce as a matter of practical and constitutional necessity can be obtained *ex parte* on the basis of constructive service of process [14] with permanent future ef-

---

14. The affidavit of one of the two Plaintiffs indicates that his spouse is available

for service in Florida; and, as recited earlier, the state has stipulated that both

fect upon the lives and property of third persons as well as the rights of sister states. The state must go slow, it must be careful, and when it undertakes to act, it owes a duty to other states and other affected parties to make a record in support of its judgment that will withstand collateral attack and merit full faith and credit. The Florida residency requirement, proof of which must be corroborated, is not a "drastic means" of endeavoring to obtain that vital objective either in terms of the length of the residency period or in its effect upon the right it qualifies. Time is the essence of an abortion or an election or the receipt of welfare assistance (upon which the necessities of life may depend), but it is virtually irrelevant in the case of divorce. The penalty to interstate travel is *de minimis*, and to the extent such penalty does exist, it is justified by a compelling state interest.

The Plaintiffs' complaints are hereby dismissed.

of the named Plaintiffs are *bona fide* residents. Plaintiffs' class, however, is broad enough to include those with out-of-state spouses and, of course, the issue raised is the constitutionality of the statute *on its face*.