500 F.2d 577
 Catherine L. MAKRES and Seymour B. Shiffman, Plaintiffs-Appellants,
v.
Reuben O'Donovan ASKEW, Governor of the State of Florida,
and Robert Shevin, Attorney General for the State
of Florida, Defendants-Appellees.
 No. 73-2816.
 United States Court of Appeals, Fifth Circuit.
 Sept. 18, 1974.
 
 Richard A. Bokor, Tampa, Fla., Larry H. Spalding, Sarasota, Fla., for plaintiffs-appellants.
 Robert L. Shevin, Atty. Gen., Jerry Ernest Oxner, Asst. Atty. Gen., Tallahassee, Fla., Baya Harrison, Asst. Atty. Gen., Tampa, Fla., Herbert T. Schwartz, Sp. Asst. Atty. Gen., Gainesville, Fla., for defendants-appellees.
 Before BROWN, Chief Judge, and GODBOLD and RONEY, Circuit Judges.
 GODBOLD, Circuit Judge:
 
 
 1
 Catherine Makres and Seymour Shiffman, appellants in this consolidated class action, wished to secure divorces in Florida state court. They filed separate suits, later consolidated, in the federal District Court alleging that they were bona fide Florida residents who would file for divorce but for Fla.Stat. 61.021, which requires that 'the party filing the (divorce) proceeding must reside six months in the state before filing the petition.'[1] They claimed that 61.021 interfered with their interests in unimpeded travel and access to courts, and that therefore it was unconstitutional under the due process and equal protection clauses of the Fourteenth Amendment. They sought a declaratory judgment to that effect and an injunction against its enforcement.[2]
 
 
 2
 The District Court found that the statutory residency requirement impinged upon interstate travel and must, therefore, be examined under the compelling interest test rather than the rational basis test. It held the state's interests were compelling[3] and dismissed. We affirm.
 
 
 3
 In a pretrial order the state stipulated that appellants were bona fide Florida residents. We understand that to mean that they were domicilaries, see Ogden v. Ogden, 159 Fla. 604, 33 So.2d 870 (1948) (establishment of residence with bona fide intent to make it permanent is prerequisite to jurisdiction), that is, the state authorities responsible for enforcing Florida law would view them as meeting the traditional basic requirement for state court jurisdiction to decree an ex parte divorce. Absent, however, was the six months of in-state residence required by 61.021. Under Florida case law, unless 61.021 is satisfied Florida courts lack power to decree a divorce. Kutner v. Kutner, 159 Fla. 870, 33 So.2d 42 (1948). The section creates a statutory barrier higher than that posed by the requirement of traditional domicile. See Hostler v. Hostler, 151 So.2d 672 (Fla.App.1963); Brown v. Brown, 123 So.2d 382 (Fla.App.1960) (where wife was domiciliary but not six-month resident, she could not file for divorce). Thus it is clear that the section divides the class of domiciliaries into two groups, those who have resided in the state for at least six months, and those who have not. The former are granted access to divorce courts and the latter are denied it. The impact of this grouping upon the right of interstate travel is clear. Dunn v. Blumstein, 405 U.S. 330, 339-341, 92 S.Ct. 995, 31 L.Ed.2d 274, 282-283 (1972). Thus, the District Court correctly held the compelling interest test applicable, and the question becomes one of whether that court correctly held the test to have been met.
 
 
 4
 The starting point of our analysis is Williams v. North Carolina,325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945) (Williams II). In Williams II the petitioner, theretofore domiciled in North Carolina, went to Nevada, where he obtained an ex parte divorce, immediately remarried, and returned to North Carolina to live with his new wife. Prosecuted for bigamous cohabitation, he raised the divorce as a defense. The North Carolina court permitted the prosecutor to attack Nevada's jurisdiction to grant the divorce. Petitioner was convicted. The Supreme Court, in a celebrated opinion by Justice Frankfurter, upheld the conviction, establishing that the jurisdictional fact of domicile, though found favorably to the divorce-seeking party in the courts of the divorcing state (Nevada), may be redetermined in the courts of another state (North Carolina).
 
 
 5
 Because of Williams II, every divorce decree is exposed to the possibility of future collateral attack in a different state. The attack can arise in a variety of contexts-- a criminal charge of bigamy (as in Williams II), questions of devolution of property upon death, assertion of power over a supposedly dissolved marriage in later divorce or support proceedings, legitimacy of children born of subsequent unions of either or both spouses with others, and so on. When an attack does occur, the effects upon those relying upon the validity of the divorce range from irksome to disastrous. Dire consequences may fall upon innocent bystanders, as when the children of parents remarried to others find themselves regarded as illegitimate. Nor are the ill effects confined to persons who secure divorces soon after in-migrating from another state. If a state becomes known for granting 'quickie' divorces, the likelihood of attack on all its divorces increases, even those secured by long-time domiciliaries. Even unsuccessful attacks cause serious aggravation, and, to an extent, disrespect for a state's divorce decrees tends to debase the coinage of all its judicial decrees.
 
 
 6
 We hold that the state of Florida, as the embodiment of all its people, has a compelling interest in minimizing the likelihood that its divorce decrees will be challenged in other states[4] and insuring the failure of any challenges that are mounted. domicil . . . Domicile implies a power to grant a divorce-- jurisdiction, strictly speaking-- is founded on domicil . . . domicile implies a nexus between person and place of such permanence as to control the creation of legal relations and responsibilities of the utmost significance . . .. Divorce, like marriage, is of concern not merely to the immediate parties. It affects personal rights of the deepest significance. It also touches basic interests of society. Since divorce, like marriage, creates a new status, every consideration of policy makes it desirable that the effect should be the same wherever the question arises.
 
 
 7
 Williams II, 325 U.S. at 229-230, 65 S.Ct. at 1095, 89 L.Ed. at 1581-1852. Domicile is, however, a 'rather elusive relationship between person and place.' Id. at 233, 65 S.Ct. at 1097, 89 L.Ed. at 1589. A state can construct means to make less slippery the jurisdictional predicate for the divorces it grants, imparting to them a verity that tends to safeguard them against the suspicious eyes of other states' prosecutorial authorities, the suspicions of private counsel in other states, and the post-decree dissatisfactions of parties to the divorce who wish a second bite. Such a reputation for validity of divorce decrees is not, then, merely cosmetic. It exists because residence for some non-transitory period, though not a sine qua non of domicile, is at least more often than not concomitant to domicile. In examining divorce decrees in the light of interstate relations it is too easy to focus upon the prevention of sham assertions of domicile. We think it is fair to accept that in Florida and almost all states divorces are granted at the 'real' domicile of the marriage partners rather than at sham domiciles or those acquired by one or both partners for the purpose of divorce. Thus the protection that Florida seeks to provide redounds primarily and affirmatively to the benefit of its 'real' domiciliaries, the incidents of whose marriages-- children, property, etc.-- will in more cases than not be Florida-centered.
 
 
 8
 Also, as pointed out by the District Court in its opinion, 359 F.Supp. at 1231, under a federal system each state owes an obligation to the other states to make a record that will tend to withstand collateral attack and merit full faith and credit. The courts, overburdened as they are, are served by means which minimize needless collateral litigation concerning the validity of foreign divorce decrees.
 
 
 9
 In Wymelenberg v. Syman, 328 F.Supp. 1353 (E.D.Wis.1971), a three-judge District Court brushed aside what it termed the interest of the state of Wisconsin in not having a reputation as a divorce mill, and suggested that there was little danger to the state 'provided that the law of domicile is followed in determining jurisdiction over a divorce matter.' 328 F.Supp. at 1356. This overemphasizes the interest of the state as cosmetic when in fact it is much deeper, and underemphasizes the entwinement of the issues of residence and domicile.[5]
 
 
 10
 The District Court opinion suggested that the stringency of the compelling interest standard may vary in proportion to the relative importance of that personal interest whose impairment triggers the test by burdening interstate travel. Thus, in the District Judge's view, a case in which interstate travel is burdened by deprivation of voting rights should be considered under a stricter standard than a case where the burden on interstate travel is imposed by denial of access to divorce courts. There may be support in recent Supreme Court cases for ranking various travel-burdening deprivations and adjusting the strictness of the scrutiny accordingly. See Memorial Hospital v. Maricopa County, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306, 315-316 & n. 15 (1974) (free nonemergency medical care), citing Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973) (lower tuition rates at state university; permanent irrebuttable presumption struck down but one-year waiting period upheld). Cf. also Gunther, In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1 (1972). But we do not rely upon this approach.[6] For the moment we treat the compelling interest standard as unitary and inflexible and we hold that the District Court did not err in holding that Florida's six-month requirement, because needed to promote the state's compelling interest, does not violate Fourteenth Amendment guarantees.
 
 
 11
 We intimate no views on the validity of longer durational requirements.
 
 
 12
 Affirmed.
 
 
 
 [1]
 Makres claimed that she became a bona fide Florida resident July 13, 1971, and that her husband resided in New York. She filed her complaint in federal court August 25, 1971. It appears her suit was delayed pending the Supreme Court's decision in Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). Eventually it was revived and consolidated with Shiffman's suit. Shiffman claimed bona fide residency as of December 30, 1972. His wife resided in Florida in a different city. He filed his federal complaint January 19, 1973
 
 
 [2]
 Upon the ground that an injunction was unlikely to be granted, no three-judge district court was convened
 
 
 [3]
 Shiffman v. Askew, 359 F.Supp. 1225 (M.D.Fla.1973)
 
 
 [4]
 See Note, 51 Texas L.Rev. 585, 593-594 & nn. 37-38 (1973)
 
 
 [5]
 We think it is worth noting, although it was not made a ground of the decision, that the residence period required by the Wisconsin statute was two years
 
 
 [6]
 Thus, we need not attempt to assign a rank to the deprivation suffered by appellants in the present case. Cf. Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)